UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jessica Baribeau; Jamie Jones; Kate Kibby, on her own
behalf and as guardian for her minor brother Kyle Kibby;
Raphi Rechitsky; Jake Sternberg; and Christian Utne,

        Plaintiffs,

v.

                                             Civ. No. 06-4953 (JNE/SRN)
                                             ORDER

City of Minneapolis, Inspector Jane Harteau, Sgt. Tim
Hoeppner, Sgt. E.T. Nelson, Sgt. John Billington, Sgt. D.
Pommerenke, Sgt. Erica Christensen, Officer Tim Merkel,
Officer Roderic Weber, Officer Sherry Appledorn, Officer
Jeanine Brudenell, Officer Robert Greer, Officer Jane Roe
(whose true name is unknown), Officer Jane Doe (whose
true name is unknown), County of Hennepin, Sean Kennedy,
Becky Novotny, Sam Smith (whose true name is unknown),
and Officer Mary Jones (whose true name is unknown),

        Defendants.

---

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, appeared on behalf of Plaintiffs
Jessica Baribeau; Jamie Jones; Kate Kibby, on her own behalf and as guardian for her
minor brother Kyle Kibby; Raphi Rechitsky; Jake Sternberg; and Christian Utne.

James A. Moore, Esq., Minneapolis City Attorney's Office, appeared on behalf of Defendants
City of Minneapolis, Inspector Jane Harteau, Sgt. Tim Hoeppner, Sgt. E.T. Nelson, Sgt. John
Billington, Sgt. D. Pommerenke, Sgt. Erica Christensen, Officer Tim Merkel, Officer Roderic
Weber, Officer Sherry Appledorn, Officer Jeanine Brudenell, Officer Robert Greer, Officer Jane
Roe (whose true name is unknown), and Officer Jane Doe (whose true name is unknown).

Michael B. Miller, Esq., Hennepin County Attorney's Office, appeared on behalf of Defendants
County of Hennepin, Sean Kennedy, Becky Novotny, Sam Smith (whose true name is
unknown), and Officer Mary Jones (whose true name is unknown).

---

       During the Minneapolis Aquatennial in 2006, Plaintiffs[1] were arrested in downtown

Minneapolis after participating in what they describe as a "zombie dance party," an event that

---

[1]      Kate Kibby participates in this action on her own behalf as well as in her capacity as
guardian of her brother, Kyle Kibby, a minor.  For simplicity, the Court refers to Kyle Kibby and
the six plaintiffs collectively as "Plaintiffs."

involved wearing fake blood on their faces, playing music and amplified spoken phrases from improvised sound systems, and other activities they claim were meant to call attention to the shortcomings of consumerist culture.  Plaintiffs assert various claims arising out of their detention, search, and arrest.  They have brought suit under 42 U.S.C. § 1983 (2000), as well as for claims of false imprisonment, assault, battery, and defamation, against Defendants City of Minneapolis, Inspector Jane Harteau, Sgt. Tim Hoeppner, Sgt. E.T. Nelson, Sgt. John Billington, Sgt. D. Pommerenke, Sgt. Erica Christensen, Officer Tim Merkel, Officer Roderic Weber, Officer Sherry Appledorn, Officer Jeanine Brudenell, Officer Robert Greer, Officer Jane Roe (whose true name is unknown), and Officer Jane Doe (whose true name is unknown) (collectively, the City Defendants).  In addition, Plaintiff Sternberg asserts various claims under section 1983, as well as claims for disability discrimination, against Defendants County of Hennepin, Sean Kennedy, Becky Novotny, Sam Smith (whose true name is unknown), and Officer Mary Jones (whose true name is unknown) (collectively, the County Defendants).  The case is before the Court on Defendants' motions for summary judgment.  While the Court doubts, especially with the benefit of hindsight, that the arrests were strictly necessary, for the reasons stated below, the Court grants the motions of the Defendants.

## I.    BACKGROUND

At about 6:00 p.m. on July 22, 2006, during the 2006 Minneapolis Aquatennial celebration, Plaintiffs gathered at the Nicollet Mall light rail station in downtown Minneapolis in order to walk and dance through downtown Minneapolis while pretending to be zombies.  They refer to this activity as a "zombie dance party."  To simulate the sickly appearance of zombies, some Plaintiffs had applied white powder and fake blood to their faces and wore dark makeup around their eyes.  Plaintiffs left the light rail station and made their way to the intersection of

South Seventh Street and Nicollet Avenue, alternately dancing and walking in a lurching, zombie-like fashion.

Plaintiffs carried four backpacks and bags with them. These bags held sound systems that had been assembled from second-hand parts. Three bags contained some variety of speakers for playing music. Attached to the outside of one bag, for example, was a gallon paint can with speakers fitted onto the round ends of the can. The fourth bag contained an iPod, a portable phone, and a radio device, and was attached to an exterior antenna. Plaintiffs used the radio device and antenna to broadcast a low-power radio signal, enabling the speakers in the other bags to play music from the iPod and messages spoken into the portable phone. The exterior of the bag with the paint can featured a red button attached to a wire running into the bag; this button functioned as an on/off switch for the music. The bag with the antenna also had wires protruding from it, and wires would have been visible on the other bags when they were opened to make adjustments to the sound system.

Plaintiffs assert dual purposes for participating in the zombie dance party. First, they intended to entertain themselves and others. Second, they intended the zombie dance party as social commentary or performance art related to what they believed to be the mindless nature of consumer culture. Accordingly, Plaintiffs used the sound system not only to play music but also to broadcast silly mock advertisements like "brain check on aisle five," "get your brains here," and "brains." From the antenna, Plaintiffs hung a homemade sign with the word "brains" on it. Plaintiffs invited bystanders to join them, and at least one person did so for a brief period of time.

In her deposition, Plaintiff Jones generally denied that any bystanders were disturbed or scared by Plaintiffs, though she did admit that "a couple of people that maybe I saw that would just look at us weird." She further testified that Plaintiffs probably walked close to other

pedestrians—within three feet—but she attributed this to the limited space available for travel on the sidewalks rather than an intention to approach or scare others.  Other Plaintiffs, in their deposition testimony, denied any intention to block the paths of pedestrians and claimed that they did not observe anyone who was disturbed or scared by their presence or who stepped into the street to avoid them.  In an affidavit submitted by Plaintiffs, Sara Brenner, a bystander who observed Plaintiffs' zombie dance party, states that she "observed [Plaintiffs] being very sensitive to kids that they passed, turning away if they looked frightened."  Several photographs in the record reveal that several Plaintiffs meddled with the Mary Tyler Moore statue on Nicollet Avenue, touching it in an unusual manner.

At about 7:00 p.m., Officers James F. Archer and Chad L. Martin received word that someone had called the police to report that individuals in zombie makeup were playing music and approaching or bothering pedestrians.  Archer and Martin, traveling by squad car, caught up with Plaintiffs near the intersection of South Seventh Street and Nicollet Avenue.  Defendants Merkel and Weber, responding to the same call, arrived on foot sometime after Archer and Martin.  Martin, in his deposition, asserted that as he arrived he observed Plaintiffs walking around and coming close to other pedestrians who then "scoot[ed] away" from Plaintiffs.

The officers called Plaintiffs together, mentioned the complaint, asked them to turn down their music, and instructed them not to approach, scare, or touch other pedestrians.  Archer told Plaintiffs that they had to behave or risk being arrested for disorderly conduct in the future.  Plaintiffs informed the officers that they were holding a zombie dance party and making a statement about consumerism.

During the encounter with Plaintiffs, both Archer and Merkel observed that there appeared to be electronic equipment or speakers in, or attached to, at least one of Plaintiffs' bags,

and, according to their deposition testimony, they understood this equipment to be the source of Plaintiffs' music.  Archer concluded that it would not have been appropriate to arrest Plaintiffs at that time, and Merkel stated in his deposition that, while he was annoyed by Plaintiffs, he did not believe they had done anything illegal.  Archer contacted the dispatcher to report that he had investigated the call, and he indicated to the dispatcher that Plaintiffs were a performance art group.

After the encounter with the police, Plaintiffs continued on largely as they had before, stopping near a parking garage to dance and take photographs.  Sternberg stated in his deposition testimony that, during this time, he never saw anyone who appeared afraid of Plaintiffs or who stepped into the street to avoid them.  Plaintiffs eventually arrived at the intersection of Sixth Street and Hennepin Avenue.  On the sidewalk near the intersection, someone playing drums had attracted a crowd of people, and Plaintiffs stopped to observe the show, joining the crowd. Plaintiffs turned off their music, and Sternberg used Plaintiffs' sound equipment to amplify the drumming.  In his deposition, Sternberg stated that, at this time, Plaintiffs were observed by at least one police officer who did not treat them as suspicious.

After their encounter with Plaintiffs, Merkel and Weber continued their patrol on foot and eventually met up with Defendant Hoeppner near the intersection of Seventh Street and Hennepin Avenue.  Hoeppner, who was working in the "detox van," told Merkel and Weber that he had driven past the intersection of Sixth Street and Hennepin where he had observed individuals now known to have been Plaintiffs who were wearing ghoulish makeup and had a "grunge look."  Hoeppner expressed a concern that the people he had seen were obstructing the sidewalk and might be affiliated with a group known as the "Juggalos."  According to a bulletin distributed to police officers in early or mid-July, the Juggalos were a violent gang from

Washington state known for, among other things, wearing face paint.  According to his deposition testimony, Merkel believes he told Hoeppner that he and Weber had encountered Plaintiffs earlier, but the officers nevertheless decided that Plaintiffs should be contacted again and identified in order to investigate a possible connection to the Juggalos.  Merkel and Weber departed to contact Plaintiffs, and Hoeppner then contacted Defendant Nelson, the on-duty sergeant, to inform him of his concerns regarding Plaintiffs.

Merkel and Weber approached Plaintiffs as the drumming performance was coming to an end.  Plaintiffs, no longer dancing or playing music, were on the sidewalk near a flower planter. In his deposition, Merkel stated that Plaintiffs, though they were not actively bothering anyone, were partially obstructing the sidewalk and that he observed pedestrians step into the bus lane in the street to pass by them.  Weber, in his deposition, generally corroborated Merkel's account and added that he observed a young girl become frightened of Plaintiffs, which Weber believed constituted disturbing the peace.  In contrast, testimony from Plaintiffs' depositions suggests that they were not blocking the sidewalk any more than anyone else who had observed the drumming performance and that they did not observe anyone who was frightened by their presence.

Merkel and Weber asked Plaintiffs for identification.  At least one Plaintiff, Sternberg, protested that they had not done anything wrong.  Some Plaintiffs did not have any form of identification with them, and, when this was communicated to the officers, they told Plaintiffs they were being detained, possibly on the grounds of unlawful assembly or disorderly conduct, and that they had to go to a nearby police station to be identified.  Weber used a cell phone to call Nelson, telling him that he was bringing Plaintiffs to the station.  The officers escorted Plaintiffs one and one-half city blocks to the station, and Plaintiffs were generally cooperative. At this time, neither Merkel nor Weber believed Plaintiffs' bags appeared to be dangerous.

Plaintiffs were taken to the back parking lot of the station, where they were met by officers including Defendants Nelson, Brudenell, Appledorn, Greer, Billington, and Christensen. Several Plaintiffs stated in their depositions that they heard laughter or heckling from the gathered police officers. Plaintiffs were told to take off their backpacks, and they were patted down and searched by various officers, including Greer and Appledorn. In their deposition testimony, Plaintiffs assert that during this time Nelson appeared to be angry, shouting that he did not "give a goddamn about [Plaintiffs'] fucking constitutional rights" and mentioning something about teaching Plaintiffs a lesson. Plaintiffs were moved to a holding cell inside the station.

While Plaintiffs were being searched, other officers began to examine Plaintiffs' backpacks and bags. According to his deposition testimony, Nelson observed the bags and noticed the wires and the on/off switch, and, relying on his homeland security training, he concluded that the bags might contain improvised explosive devices. He asserts that he did not know that the equipment had been used to play music, and he does not recall asking Plaintiffs or other police officers about its purpose. Though he admits he did not regard the bags to be dangerous when he first detained Plaintiffs, Weber testified in his deposition that he believed that the packs appeared to contain explosives, and, according to their deposition testimony, Billington and Brudenell also agreed with Nelson's conclusion. In contrast, Greer stated, in his deposition, that the electronic equipment in Plaintiffs' bags looked like "junk."

Defendant Pommerenke, who had received training with respect to explosives, was asked to examine the packs. Pommerenke instructed the other officers to step away from the bags, but, deeming time to be short, he did not arrange for a robot or a water cannon. The area was not evacuated. After searching Plaintiffs' bags, Pommerenke determined that they did not contain

explosives, and Appledorn photographed Plaintiffs' property.  Pommerenke informed Nelson of the results of his search.   The evidence indicates that one or more officers reviewed Minn. Stat. § 609.712 (2006), a statute that criminalizes possession of simulated weapons of mass destruction (WMD), and that Nelson and Pommerenke, potentially with input from Billington, decided to arrest Plaintiffs for possession of simulated WMD.  Police reports identify Greer, Merkel, Weber, Appledorn, Billington, and Brudenell as arresting officers.

After a short wait, Plaintiffs were removed one at a time from the holding cell, questioned about their identities and any connections to the Juggalos, and placed in the back of a police van with their hands bound behind their backs.  When questioned, Sternberg gave only his first name, refused to answer other questions, and asked to speak to a lawyer.  Officers involved in removing Plaintiffs from the holding cell and identifying or otherwise questioning Plaintiffs included Brudenell, Appledorn, Greer, and Billington.  Merkel and Weber helped run Plaintiffs' names through a computer.

Plaintiff Rechitsky asserted in his deposition that, while on his way out to the van, he was marched past Nelson, who was holding a large gun in an intimidating manner.  Rechitsky claimed that Nelson mentioned a gang or homeland security concerns, accused him of putting others in danger, and told him "[i]f I see you on the street again, I will put a bullet between your eyes."  In his deposition, Nelson admitted that he was carrying an M-16 rifle on the night Plaintiffs were arrested, but he asserted that he carries such a weapon on a daily basis and that he was not trying to intimidate anyone.  Nelson further admitted that he yelled at one of the Plaintiffs, telling him that carrying what appeared to be explosives could result in "a bullet in between [his] eyes."  Nelson explained that he was trying to impress upon Plaintiffs how dangerous and serious the situation had been.

Defendant Christensen, who had observed the arrival of Plaintiffs at the police station and then gone to sit in the van, drove Plaintiffs to the Hennepin County Adult Detention Center (the jail).[2]  Plaintiffs claim that some unidentified individuals rocked the van from the outside before they departed for the jail, and they assert that the van was driven in a reckless manner, swerving abruptly and stopping and starting suddenly.  Plaintiffs admit that no one was injured during the trip to the jail but assert that the manner the van was driven caused them discomfort.  In her deposition, Christensen stated that the drive to the jail was uneventful and that she did not swerve or start or stop suddenly.

Various jail personnel met Plaintiffs in the intake area at the jail to process Plaintiffs into the jail population.  However, because Sternberg refused to give his last name, jail personnel were unable to process him.  According to his deposition, Sternberg, whose left leg had been amputated below the knee following a motorcycle accident in 2001, did not resist being searched, and he removed his prosthetic leg and permitted a detention deputy to examine it.  Jail personnel asked Sternberg various health-related questions and then took him to a holding room near the intake area.  Later, Defendant Kennedy, a nurse at the jail, came by the room and asked Sternberg additional questions, and Sternberg again refused to give his last name.  Though Sternberg had earlier heard someone suggest his prosthetic leg should be confiscated because it had metal component parts, Sternberg heard Kennedy tell someone outside of the holding room that Sternberg could keep his leg at that time.

Defendant Novotny, who is a detention deputy, and an unidentified person visited Sternberg and escorted him to another holding room.  In the second room, Sternberg was told to sit in a wheelchair and remove his prosthetic leg so it could be confiscated.  Sternberg complied.

---

[2]      Kyle Kibby was taken to a different facility.

When Sternberg asked why his leg was being taken, Novotny told him that it was being taken for security reasons and that "the nurse" had made the decision to confiscate it.  In his deposition, Sternberg stated that, after he told Novotny that the leg was fragile and hard to replace, the person accompanying Novotny suggested that Sternberg should reveal his last name to ensure his leg would not get lost.  Sternberg accused Novotny of taking the leg in an effort to coerce him into revealing his last name, and Novotny disclaimed any such motive.  According to Sternberg, Kennedy came by later and explained that he, along with "other deputies," decided that Sternberg could not keep the leg because it could be used as a weapon.  Sternberg eventually gave jail personnel his last name, and he was processed into the jail and given jail clothes and a property receipt for his leg.  Sternberg was moved into the jail's general population and housed in a cell that complied with the Americans with Disabilities Act.  He continued to use a jail-issued wheelchair while in the jail.  Sternberg's leg was returned when he was released.

On July 24, Sergeant Wallace M. Krueger reviewed a police report regarding Plaintiffs' arrests, examined Plaintiffs' property that remained in police custody, and interviewed Kate Kibby at the jail.  Krueger determined that the items in Plaintiffs' bags appeared to be stereo equipment, and he ultimately concluded that the simulated WMD charge was not supported by probable cause.  Krueger completed paperwork permitting Plaintiffs to be released.  Plaintiffs spent two nights in jail.  No charges were ultimately filed against Plaintiffs.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify

10

"those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmoving party must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[3]

A.      **Fourth Amendment claims against the City Defendants**

In Count 1 of the Complaint, pursuant to 42 U.S.C. § 1983, Plaintiffs allege that the City Defendants deprived them of their Fourth Amendment rights by detaining, arresting, searching, and jailing them without cause to believe they had committed a crime and by using unnecessary force. *See* U.S. Const. amend. IV; U.S. Const. amend. XIV. Plaintiffs argue the police had no probable cause to initially detain them at the intersection of Sixth and Hennepin, as they contend that they were only watching a drum show and they were not blocking pedestrian traffic. Plaintiffs further argue that their subsequent arrest for simulated WMD was illegal because it followed from the initial illegal detention and because the officers could not have reasonably believed that Plaintiffs' equipment met the definition of simulated WMD under Minn. Stat. § 609.712.

The City Defendants contend that probable cause existed to believe that Plaintiffs had committed crimes and that, consequently, the arrests were legal. The City Defendants assert that,

_____

[3]      At the hearing, Plaintiffs conceded that the evidence does not support claims against Defendants Harteau, Appledorn, Greer, and Brudenell. Plaintiffs also conceded that their claims against the unidentified individuals—Defendants Roe, Doe, Smith, and Jones—should be dismissed.

even if detention of Plaintiffs was without legal basis, they are protected from civil liability by qualified immunity.

       1.     *Wrongful arrest*

      The Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," protects individuals from arrests that are unsupported by probable cause, *see Sheets v. Butera*, 389 F.3d 772, 777 (8th Cir. 2004). "Probable cause is to be determined upon the objective facts available to the officers at the time of the arrest, and exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense at the time of the arrest." *Id.* (quotations omitted; omission in original). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and probable cause may exist even though an officer believes otherwise or is mistaken about its basis. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Factors relevant to the existence of probable cause may include "arguably innocent conduct, [construed] in light of [the arresting officer's] training and experience." *Hannah v. City of Overland*, 795 F.2d 1385, 1389 (8th Cir. 1986) (quotation omitted).

      Even if Plaintiffs were arrested without probable cause, qualified immunity may still apply to shield the City Defendants from civil liability. The doctrine of qualified immunity protects state actors performing discretionary functions from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*,

533 U.S. 194, 202 (2001); *see Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are

not liable for bad guesses in gray areas; they are liable for transgressing bright lines").  In the

context of an arrest that allegedly violated the Fourth Amendment, the applicability of qualified

immunity depends on whether the defendants had "arguable probable cause."  *See Amrine v.*

*Brooks*, 522 F.3d 823, 832 (8th Cir. 2008).  Qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341

(1986), and a conclusion that qualified immunity applies does not signal that a court approves of

or condones the conduct so protected.  *See Smoak v. Hall*, 460 F.3d 768, 785 (6th Cir. 2006);

*Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998); *McBride v. Taylor*, 924 F.2d 386, 387

(1st Cir. 1991).

        a.     Disorderly conduct

       The City Defendants argue that they had probable cause to believe Plaintiffs had

committed the crime of disorderly conduct.  In relevant part, Minnesota's disorderly conduct

statute, Minn. Stat. § 609.72 (2006), states:

> Whoever does any of the following in a public or private place, including on a
> school bus, knowing, or having reasonable grounds to know that it will, or will
> tend to, alarm, anger or disturb others or provoke an assault or breach of the
> peace, is guilty of disorderly conduct, which is a misdemeanor:
> . . .
> (3) Engages in offensive, obscene, abusive, boisterous, or noisy conduct
> or in offensive, obscene, or abusive language tending reasonably to arouse
> alarm, anger, or resentment in others.

The decisions of Minnesota courts establish that this statute, to the extent it criminalizes speech,

must be construed narrowly so that it encompasses only fighting words.  *See In re S.L.J.*, 263

N.W.2d 412, 418-19 (Minn. 1978).  Accordingly, in order to comport with the First Amendment,

the statute must necessarily proscribe only words that "tend to incite an immediate breach of the

peace or to provoke violent reaction by an ordinary, reasonable person," not words that merely offend or arouse resentment. *Id*. at 420.

The statute, however, is not addressed solely to speech but also proscribes certain conduct, and Plaintiffs were not engaged purely in speech. Plaintiffs assert that First Amendment considerations require that the statute be construed narrowly so as to exclude Plaintiffs' expressive conduct. Because expressive conduct, even if sufficiently speech-related to implicate the First Amendment, is not exempt from application of general criminal laws, the Court declines to construe the statute in such a manner. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

Aside from their argument that a narrow interpretation is constitutionally required, Plaintiffs do not challenge the constitutionality of Minnesota's disorderly conduct statute. Consequently, this Court is bound by the construction that the Minnesota Supreme Court has given or would give to the statute, and the Court may consider the decisions of the state intermediate appellate court to be highly indicative of the proper interpretation. *See Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1570 (8th Cir. 1991). Minnesota courts have held that the part of the statute that prohibits noisy and boisterous conduct has separate vitality from the speech-related portions and that Minn. Stat. § 609.72 "may be applied to punish the manner of delivery of speech when the disorderly nature of the speech does not depend on its content." *In re T.L.S.*, 713 N.W.2d 877, 881 (Minn. Ct. App. 2006). Plaintiffs fail to identify contrary authority requiring courts to construe the statute as they suggest. *Cf. State v. Cooper*, 285 N.W. 903, 905-06 (Minn. 1939) (upholding conviction under a different disorderly conduct law for

peacefully engaging in picketing); *In re M.A.H.*, 572 N.W.2d 752, 757, 759-60 (Minn. Ct. App. 1997) (stating that charges brought under Minnesota's disorderly conduct statute must "be closely scrutinized" "[t]o avoid interfering with first amendment rights" and that "a defendant's words are considered as a 'package' in combination with conduct," but declining to address whether a speech-related disorderly conduct conviction could be based on the part of the statute dealing with noisy and boisterous conduct because the argument was not raised before the district court (quotations omitted)); *State v. Klimek*, 398 N.W.2d 41, 43 (Minn. Ct. App. 1986) (indicating that speech not constituting unprotected fighting words may, when combined with threatening conduct, form the basis of a disorderly conduct conviction).

In this case, the behavior of Plaintiffs observed by law enforcement could justify a reasonably prudent person in believing that Plaintiffs had committed the crime of disorderly conduct, and the City Defendants had probable cause to arrest Plaintiffs. *See State v. Soukup*, 656 N.W.2d 424, 428 (Minn. Ct. App. 2003) ("Actual commotion need not occur, rather [i]t is sufficient if defendant's conduct is likely to annoy, disturb, or arouse anger." (quotation omitted)). Accordingly, the City Defendants are entitled to summary judgment on the Fourth Amendment wrongful arrest claims in Count 1.[4]

b. Simulated WMD

The City Defendants make the alternative argument that probable cause existed to believe that Plaintiffs had committed the crime of possession of simulated weapons of mass destruction. In relevant part, Minn. Stat. § 609.712, subd. 5, states:

---

[4] While Minnesota policy does not generally permit custodial arrests for misdemeanor violations, *see* Minn. R. Crim. P. 6.01, failure to comply with such a policy is not a constitutional violation, *see Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008) (holding that an arrest is "constitutionally reasonable" "when an officer has probable cause to believe a person committed even a minor crime in his presence" even if under state law officers should have issued a summons rather than making an arrest).

> Whoever does the following with intent to terrorize another or cause evacuation of a place, whether a building or not, or disruption of another's activities, or with reckless disregard of the risk of causing terror, evacuation, or disruption, may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both:
>> (1) displays a weapon of mass destruction or a simulated weapon of mass destruction.

The statute defines "simulated weapon of mass destruction" as:

> any device, substance, or object that by its design, construction, content, or characteristics, appears to be or to contain, or is represented to be, constitute, or contain, a weapon of mass destruction, but that is, in fact, an inoperative facsimile, imitation, counterfeit, or representation of a weapon of mass destruction that does not meet the definition of a weapon of mass destruction or that does not actually contain or constitute a weapon, biological agent, toxin, vector, or delivery system prohibited by this section.

Minn. Stat. § 609.712, subd. 1(c).  "Weapon of mass destruction" is defined to include:

> weapons, substances, devices, vectors, or delivery systems that:
>> (1) are designed or have the capacity to cause death or great bodily harm to a considerable number of people through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors, disease organisms, biological agents, or toxins; or
>> (2) are designed to release radiation or radioactivity at a level dangerous to human life.

*Id*. § 609.712, subd. 1(f).

While the statute requires that a WMD have some chemical, biological, or radioactive component, it is not clear whether simulated WMD must incorporate some corresponding simulated chemical, biological, or radioactive element.  Specifically, it is unclear whether the phrase "representation of a weapon of mass destruction that does not meet the definition of a weapon of mass destruction or that does not actually contain or constitute a weapon, biological agent, toxin, vector, or delivery system" indicates that a simulated WMD must actually appear to be a WMD in all regards or whether a simulated WMD must merely appear similar to a WMD in some or most regards, which would mean that a simulated WMD need not mimic all the features

of a WMD.  There is no case law to guide the Court's interpretation, as the Court is unable to find an opinion by any court, state or federal, that cites Minn. Stat. § 609.712, which became effective in July 2002.  Given the harsh penalties prescribed and the context of the statute's apparent emphasis on biological and chemical hazards, *see, e.g.*, Minn. Stat. § 609.712, subd. 1(b), (d), (e), & subd. 3, the Court predicts that the Minnesota Supreme Court, were it to interpret this statute, would conclude that simulated WMD must feature some simulated biological, chemical, or radioactive element.  *See State v. Maurstad*, 733 N.W.2d 141, 148 (Minn. 2007) ("[W]hen the language of a criminal law is ambiguous, we construe it narrowly according to the rule of lenity."); *Chiodo v. Bd. of Ed. of Special Sch. Dist. No. 1*, 215 N.W.2d 806, 808 (Minn. 1974) ("[W]ords of a statute are to be viewed in their setting, not isolated from their context.").

Under such an interpretation, the statute would have been inapplicable to Plaintiffs because, while an objective observer could have reasonably believed Plaintiffs' packs resembled homemade explosives due to the exposed wiring and the red button, the record is devoid of any evidence suggesting that Plaintiffs' packs might have incorporated any biological, chemical, or radioactive element.  Accordingly, the City Defendants would have been without probable cause to arrest Plaintiffs for possession of simulated WMD.  However, given the ambiguous nature of the statute and the absence of case law addressing its application, it would not have been clear to a reasonable officer that Plaintiffs could not be arrested for violating Minn. Stat. § 609.712, and the City Defendants are therefore entitled to qualified immunity.  *See Mustafa v. City of Chicago*, 442 F.3d 544, 549 (7th Cir. 2006) ("[W]here the law is open to interpretation, qualified immunity protects police officers who reasonably interpret an unclear statute."); *cf. United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (stating that courts "should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal

defense attorney" and concluding that probable cause existed to believe plaintiff had violated a statute even thought officer was reasonably mistaken as to whether the statute applied to plaintiff).  For this reason, the Court would dismiss Plaintiff's Fourth Amendment wrongful arrest claims even if the City Defendants did not have probable cause to arrest Plaintiffs for disorderly conduct.

> 2.     *Excessive force*

Plaintiffs have made no argument regarding the Fourth Amendment excessive force claim contained in Count 1 of their Complaint.  The Court presumes it is premised on the same conduct that forms the basis of Plaintiffs' battery claim, that is, that Defendant Christensen allegedly drove the van containing Plaintiffs to the jail in a manner intended to cause them harm or distress.

Fourth Amendment claims regarding excessive force by arresting officers should be analyzed under the Fourth Amendment's reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397; *see Winters v. Adams*, 254 F.3d 758, 765 (8th Cir. 2001).  The evidence demonstrates that no Plaintiff fell from the benches in the back of the van and that the drive to the jail caused no Plaintiff anything other than temporary physical discomfort.  *Cf. Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993) ("While excessive force does not require injury, no injury gives weight to the assertion of no excessive force." (citation omitted)); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (stating "although [plaintiff] did testify that he was pushed against a wall twice on the way to the holding area, he also testified he sustained no injury as a

CASE 0:06-cv-04953-JNE-SRN   Document 54   Filed 09/12/08   Page 19 of 32

result of being pushed" and affirming district court's order granting summary judgment for

defendants). Under these circumstances, the Court concludes that no genuine issue of material

fact remains regarding Plaintiffs Fourth Amendment excessive force claim, and summary

judgment in favor of the City Defendants is appropriate. *See Graham*, 490 U.S. at 396 ("Not

every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

violates the Fourth Amendment." (quotation omitted)).

**B.    Substantive due process claims against the City Defendants**

In Count 2 of the Complaint, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that their

arrests by the City Defendants violated their substantive due process rights. *See U.S. Const.

amend. V; U.S. Const. amend. XIV.* Plaintiffs declined to make any argument opposing

summary judgment on this claim either in their memorandum opposing the City Defendants'

motion for summary judgment or at the motion hearing. Moreover, Plaintiffs' substantive due

process claims appear duplicative of their First and Fourth Amendment claims and therefore

should be analyzed as such. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a

particular Amendment provides an explicit textual source of constitutional protection against a

particular sort of government behavior, that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims." (quotations omitted)).

Even if Plaintiffs' substantive due process claims are not subsumed by their other constitutional

claims, the existence of probable cause or arguable probable cause to arrest Plaintiffs would

appear to preclude Plaintiffs from establishing, as they must to prevail on their substantive due

process claims, that the decision to arrest them was so outrageous as to be conscience-shocking.

*See Clemmons v. Armontrout*, 477 F.3d 962, 965 (8th Cir. 2007). Accordingly, Count 2 will be

dismissed.

**C.      First Amendment claims against the City Defendants**

In Count 3 of the Complaint, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that the City Defendants arrested them for exercising their First Amendment rights to free speech, that is, for expressing a message of anti-consumerism by participating in the zombie dance party.  *See* U.S. Const. amend I.  Because probable cause existed to arrest Plaintiffs, the City Defendants are entitled to summary judgment on this claim.  *See Hartman v. Moore*, 547 U.S. 250, 265-66 (2006); *cf. Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest [the plaintiff] for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims.").

**D.      Conspiracy claims against the City Defendants**

In Count 4 of the Complaint, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that the City Defendants conspired to deprive them of their constitutional rights.  *See* U.S. Const. amend. I; U.S. Const. amend. IV; U.S. Const. amend. V; U.S. Const. amend. XIV.  A violation of Plaintiffs' constitutional rights is a prerequisite to recovery under their conspiracy claim.  *See White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008); *cf. Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995) (indicating that section 1983 conspiracy claim was not actionable where defendants were entitled to qualified immunity as to the underlying alleged constitutional violations).  As explained elsewhere in this Order, Plaintiffs fail to raise a genuine issue of material fact as to a violation of their constitutional rights.  Accordingly, the City Defendants are entitled to summary judgment on Count 4.

**E.      Failure to train and supervise claims against the City Defendants**

In Count 5 of the Complaint, Plaintiffs allege, pursuant to 42 U.S.C. § 1983, that the City of Minneapolis failed to properly train and supervise Defendant police officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiffs.  Plaintiffs allege that this failure to train and supervise implicitly authorized or encouraged the violations of their constitutional rights.  Plaintiffs point out that Defendants Merkel and Weber testified in their depositions that they could not recall having had any First Amendment training.  Plaintiffs also point to Defendant Nelson's lengthy disciplinary history related to use of excessive force and other matters.

To prevail on their failure to train and supervise claims, Plaintiffs must establish an underlying violation of their constitutional rights.  *See Olinger v. Larson*, 134 F.3d 1362, 1367 (8th Cir. 1998); *cf. Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("While a municipality does not enjoy qualified immunity from damages liability that results from a policy that is itself unconstitutional or from an unconstitutional decision by municipal policymakers, . . . a municipal policymaker cannot exhibit[, as he or she must to be found liable for failure to train or supervise,] fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." (citation omitted)).  As discussed above, Plaintiffs fail to establish any genuine issue of material fact about whether such a violation occurred.  Therefore, the City of Minneapolis is entitled to summary judgment on Count 5.

**F.    False imprisonment claims against the City Defendants**

In Count 6 of the Complaint, Plaintiffs allege that the City Defendants wrongfully and illegally confined and restrained Plaintiffs without their consent, thereby entitling Plaintiffs to recover under state law for false imprisonment.  The City Defendants argue that Plaintiffs' claims fail because they had probable cause to arrest Plaintiffs and that, in the alternative, the City Defendants are entitled to official immunity.

To establish false imprisonment in the context of an arrest by law enforcement officers, a plaintiff must prove he or she was arrested without probable cause.  *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990); *Lundeen v. Renteria*, 224 N.W.2d 132, 135-36 (Minn. 1974).  As discussed above, the City Defendants had probable cause to arrest Plaintiffs for disorderly conduct.  *See State v. Harris*, 121 N.W.2d 327, 330 (Minn. 1963) (stating that probable cause has been defined as "'a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty'" (quoting *Garske v. United States*, 1 F.2d 620, 623 (8th Cir. 1924))).

In addition, the Court concludes that the City Defendants are entitled to official immunity for their decision to arrest Plaintiffs for possession of simulated WMD, a felony offense that would justify custodial arrest, *see* Minn. Stat. § 609.712; Minn. R. Crim. P. 6.01, subd. 2.  "Under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion."  *Johnson*, 453 N.W.2d at 41.  The duties of police officers generally require the exercise of judgment or discretion.  *See id*. at 42.  Official immunity will not apply if an officer commits a willful or malicious wrong.  *Elwood v. County of Rice*, 423 N.W.2d 671, 679 (Minn. 1988).  For purposes of official immunity, willful and malicious are synonymous and are defined

22

as "the intentional doing of a wrongful act without legal justification or excuse." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). To establish malice, a plaintiff must do more than allege malice; the plaintiff must present specific facts showing the officers intentionally acted wrongfully without legal justification or excuse. *See Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. Ct. App. 1990).

While it appears that certain of the City Defendants were annoyed by Plaintiffs, there is no evidence that the decision to arrest Plaintiffs for possession of simulated WMD was not based on an actual and good faith belief that Minn. Stat. § 609.712 was applicable. To the contrary, as discussed above, a belief that Plaintiffs had violated Minn. Stat. § 609.712 was reasonable in light of the ambiguous nature of the statute, and the evidence indicates that one or more officers reviewed the statute before the decision was made to arrest Plaintiffs for possession of simulated WMD. Accordingly, the City Defendants are entitled to official immunity for the decision to arrest Plaintiffs for felony violation of Minn. Stat. § 609.712, and Plaintiffs may not recover for their subsequent detention. The City Defendants are entitled to summary judgment on Count 6.

## G.     Assault claims against the City Defendants

In Count 7 of the Complaint, Plaintiffs allege that the City Defendants committed the state-law tort of assault. Specifically, Plaintiffs argue that Nelson assaulted Rechitsky by "purposely [standing] close to him with an automatic weapon in a manner that created fear."

An assault is an unlawful threat to do bodily harm to another made by one having the present ability to carry out the threat where the display of force is such that it causes the assaultee "reasonable apprehension of immediate bodily harm." *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939); *see Johnson*, 453 N.W.2d at 41. "Mere words or threats alone do not constitute assault." *Dahlin*, 288 N.W. at 852.

According to Rechitsky, Nelson's statements to him dealt with some potential future

encounter, not any intent to cause him harm at that time.  Moreover, there is no evidence that

Nelson made any affirmative action that would have reasonably caused Rechitsky apprehension

of immediate bodily harm.  *Cf. Elwood*, 423 N.W.2d at 679 ("Plaintiffs concede the deputies

never pointed the shotgun at them or threatened them with it, and words alone do not constitute

assault.").  Accordingly, no genuine issue of material fact remains regarding Plaintiffs' assault

claim, and the City Defendants are entitled to summary judgment on the assault claim in Count 7

of the Complaint.

**H.    Battery claims against the City Defendants**

Also in Count 7 of the Complaint, Plaintiffs allege that the City Defendants are liable for

battery under state law.  Specifically, Plaintiffs argue that Christensen committed battery when

she "drove the police van to jail in a jerky manner that could only have been intentional."[5]

A battery is an intentional unpermitted offensive contact with another.  *See Paradise v.*

*City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).  "[A] police officer is permitted to

come in contact with an individual in the course of arresting and detaining him to the extent it is

'necessary' to effectuate such arrest and detention."  *Id*. at 155; *see* Minn. Stat. § 609.06 (2006)

---

[5]     While the Complaint alleges both assault and battery, Plaintiffs' memorandum in opposition to the City Defendants' motion for summary judgment appears to characterize Plaintiffs' claims related to Christensen's driving as assault.  Because the allegations against Christensen are most appropriately characterized as allegations of battery, *see Schumann v. McGinn*, 240 N.W.2d 525, 529 (Minn. 1976) ("'An actor is subject to liability to another for battery if '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and '(b) an offensive contact with the person of the other *directly or indirectly* results.'" (quoting Restatement (Second) of Torts § 18) (emphasis added)), the Court addresses treats them as claims for battery.
        To the extent that the Complaint can be construed to assert a battery claim related to allegations that the van was rocked or shaken by individuals outside the van before it departed the police station, Plaintiffs have made no such argument in connection with the present motions, and Plaintiffs have produced no evidence regarding the identities of such individuals.

(stating that a "public officer" is permitted to use reasonable force "in effecting a lawful arrest").

When a battery claim is brought against a police officer, "the unreasonableness of the force used

is an element of the action and the burden of proving such unreasonableness is on plaintiff."

*Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984).

Christensen transported Plaintiffs to the jail as part of Plaintiffs' detention, and therefore

Christensen was entitled to use reasonable force to do so.  Under the circumstances of this case,

the Court concludes that reasonable force includes those forces to which an individual would

normally be exposed during a ride in the back of a van.  While a plaintiff may recover nominal

damages even if no actual injury results from a battery, *see Paradise*, 297 N.W.2d at 156, it is

significant that Plaintiffs arrived at the jail unharmed.  Given that Plaintiffs were necessarily

exposed to some forces during transportation, the absence of injury indicates that Christensen's

driving was not unreasonable.  The Court concludes that Plaintiffs are unable to meet their

burden of proving that Christensen's actions were unreasonable, and the Court further concludes

that no genuine issue of material fact remains on that issue.  The City Defendants are entitled to

summary judgment on the battery claim in Count 7 of the Complaint.

## I.      Defamation claims against the City Defendants

In Count 8 of the Complaint, Plaintiffs allege that the City Defendants defamed them by

arresting them under circumstances that caused them to be falsely accused of criminal conduct of

a scandalous and inflammatory nature.  In response, Defendants argue, among other things, that

they are entitled to absolute immunity from defamation claims arising out of their reports and

arrest decisions.

"Whether an executive officer[, including a police officer,] is absolutely immune from

defamation liability depends on many factors, including the nature of the function assigned to the

officer and the relationship of the statements to the performance of that function." *Carradine v. State*, 511 N.W.2d 733, 736 (Minn. 1994). Under Minnesota law, a police officer is absolutely immune from civil suits related to allegedly defamatory statements made in an arrest report because preparation of arrest reports are a key part of an arresting officer's job, such reports are useful both to the arresting officer's superiors and to prosecutors, such reports play a significant role in trials of criminal defendants, and the possibility of defamation liability would deter complete and detailed reporting. *Id.* "[T]he rationale is that unless the officer in question is absolutely immune from suit, the officer will timorously, instead of fearlessly, perform the function in question and, as a result, government—that is, the public—will be the ultimate loser." *Id.* at 735. Accordingly, the City Defendants are entitled to absolute immunity from civil liability for defamation for statements in their reports and official documentation, including statements about the determination that probable cause existed to arrest Plaintiffs under Minn. Stat. § 609.712. *See Carradine*, 511 N.W.2d at 734-36 (applying absolute immunity to bar liability where a police report stated that the plaintiff's conduct involved "reckless driving, fleeing an officer, and impersonating an officer" and where those charges apparently gave rise to plaintiff's defamation claim). Plaintiff's defamation claims against the City Defendants are barred by absolute immunity, and summary judgment is appropriate.

**J.      Claims for violation of the ADA and MHRA against the County Defendants**

        In Count 9 of the Complaint, Plaintiff Sternberg alleges that the County Defendants, by confiscating his prosthetic leg, denied him the benefit of jail services and discriminated against him in violation of the Americans with Disabilities Act (ADA) and the Minnesota Human Rights Act (MHRA). He further asserts that the jail-supplied wheelchair and ADA-compliant cell did not constitute reasonable accommodations. The County Defendants argue that confiscation of

Sternberg's leg was not discrimination based on disability but was instead a reasonable response to safety concerns related to Sternberg's leg.

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2000). Similarly, the MHRA states "[i]t is an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of . . . disability . . . or to fail to ensure physical and program access for disabled persons unless the public service can demonstrate that providing the access would impose an undue hardship on its operation." Minn. Stat. § 363A.12, subd. 1 (2006).

Neither the ADA nor the MHRA, however, requires jails or prisons to take actions that unduly jeopardize their safety and security. *See Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 285-86 (1st Cir. 2006) (holding that defendant did not violate the ADA when, for security reasons, it denied an inmate the use of his cane which in turn prevented the inmate from using the outdoor recreation yard); *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (ordering district court to consider, in determining on remand whether the ADA required a prison to provide an interpreter to a deaf inmate, evidence related to safety and security issues); Minn. Stat. § 363A.11, subd. 4 (2006) (indicating the MHRA does not apply in situations where compliance with the MHRA would pose "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services"); *id.* § 363A.12, subd. 1 (stating that discriminatory access to public services that would otherwise violate the MHRA is permissible if allowing equal access "would impose an undue hardship on its operation" in light of, among other things, "the type and

purpose of the public service's operation"); 28 C.F.R. § 35.130(b)(7) (2007) (stating that public entities are not required to make reasonable modifications to their policies and practices to avoid discrimination on the basis of disability when "the modifications would fundamentally alter the nature of the service, program, or activity").  Matters of safety and security are largely entrusted to the discretion of the jail or prison officials, and their decisions regarding such matters are proper so long as they are rational.  *See Pargo v. Elliott*, 49 F.3d 1355, 1356-57 (8th Cir. 1995) (stating that "when a regulation restricting inmates' constitutionally protected rights is challenged, the appropriate standard of review is whether the regulation is rationally related to a legitimate penological purpose" because, when matters of internal prison security are at issue, "courts should not substitute their judgment for that of prison administrators" (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987))); *Gates v. Rowland*, 39 F.3d 1439, 1447 (9th Cir. 1994) ("[W]e deem the applicable standard for the review of the [ADA]'s statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting, as outlined by the Supreme Court in *Turner v. Safley*.").

In this case, the evidence establishes that reasonable concerns for jail safety caused Sternberg's leg to be confiscated, and the Court further concludes that, on this record, any other justification for taking Sternberg's leg is purely speculative.[6]  Pre-existing jail policies suggest that possession of a prosthesis by an inmate may pose security risks.  Jail officials repeatedly told Sternberg that his removable prosthetic was taken because of concerns that it could be used as a weapon.  Furthermore, the evidence reveals that Sternberg was uncooperative at least insofar as he refused to provide his last name.  That no single person could be identified as having made

---

[6]     Even the statement by an unidentified jail staff member suggesting that Sternberg's leg would be less likely to be misplaced if he provided his last name indicates that Sternberg's leg would have been confiscated regardless of whether gave his last name.

the decision to take Sternberg's leg, that the leg was not confiscated immediately, and that parts

of the wheelchair given to Sternberg could conceivably have been detached and used as weapons

do not change the Court's conclusions.  *See Hill v. Blackwell*, 774 F.2d 338, 345 (8th Cir. 1985)

(stating that "unguided substitution of judicial judgment for that of the expert prison

administrators" on safety and security matters "is inappropriate" (quotations omitted)).

      In addition, Sternberg fails to establish that, following seizure of his leg, provision of a

wheelchair and an ADA-compliant cell was not a reasonable accommodation.  In arguing that

reasonable accommodations were not made, Sternberg asserts only his strong and legitimate

preference for segregation in an alternate housing assignment and continued use of his prosthetic

leg over assignment to an ADA-compliant cell in general population and use of a wheelchair.  In

the absence of a showing that other accommodations are not reasonable, the ADA does not,

however, require implementation of a plaintiff's preferred accommodation.  *See Cravens v. Blue

Cross & Blue Shield*, 214 F.3d 1011, 1019 (8th Cir. 2000).

      Sternberg asserts that the County Defendants' safety rationale is untenable because the

seizure of his leg allegedly violates jail policies.  The policies identified as relevant by Sternberg

state that "[t]he facility shall provide or make provisions for othoses, prostheses and other aids

for impairments as deemed necessary" and that "[i]nmates with medically necessary prosthetics

that may jeopardize the security of the facility may be assigned alternate housing assignments to

assure the safety of other inmates and staff members."  Sternberg cites no authority that indicates

that either the ADA or the MHRA require compliance with the jail policies he identifies.  *Cf.

Randolph*, 170 F.3d at 859 (indicating that a state law requiring prison to provide an interpreter

to a deaf inmate does not mean an interpreter is required under the ADA).  However, even

assuming the ADA and MRHA so require, Sternberg's argument fails because he has not

established that the County Defendants' actions were inconsistent with jail policy.  Again asserting only his preference for use of his prosthetic leg over a wheelchair, Sternberg fails to establish that his prosthetic leg is "necessary" or "medically necessary" within the meaning of the policies he cites.  Accordingly, the Court concludes that no genuine issue of material fact remains, and summary judgment on Sternberg's ADA and MHRA claims in favor of the County Defendants is warranted.

**K.      Due process claims against the County Defendants**

In Count 10 of the Complaint, Sternberg alleges, pursuant to 42 U.S.C. § 1983, that the County Defendants deprived him of his constitutional right to due process when they confiscated his prosthetic leg.  *See* U.S. Const. amend. V; U.S. Const. amend. XIV.  Specifically, Sternberg alleges that confiscation of his leg was arbitrary and unjustified, thereby depriving him of property without due process, and constituted improper punishment of a pretrial detainee, thereby depriving him of a liberty interest without due process.

A detainee may not, consistent with due process, be punished prior to an adjudication of guilt, *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992), and the government may not, consistent with due process, arbitrarily or unreasonably deprive an individual of his property, *see County of Sacramento v. Lewis*, 523 U.S. 833, 845-846 (1998).  However, "the 'due process rights of prisoners and pretrial detainees [against the deprivation of their property without due process of law] are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution.'"  *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984) (per curiam) (quoting *Bell v. Wolfish*, 441 U.S. 520, 554 (1979)) (alteration in original; emphasis removed).  As discussed above, the record reveals that confiscation of Sternberg's leg was both consistent with jail policy and reasonably related to the legitimate governmental

30

interest in jail security.  *See Martinez*, 977 F.2d at 423 (holding that, while due process does not

permit a detainee to be punished prior to an adjudication of guilt, a restriction or condition

accompanying pretrial detention is not punishment if it is reasonably related to a legitimate

governmental objective); *Lyon*, 730 F.2d at 527 ("[S]ubstitution of judicial judgment for that of

the expert prison administrators in matters [of health and security] is inappropriate." (quotation

omitted)).  No genuine issue of material fact remains as to whether the County Defendants

complied with the requirements of due process, and summary judgment in favor of the County

Defendants is warranted.

**L.      Fourth Amendment claims against the County Defendants**

In Count 11 of the Complaint, Sternberg alleges, pursuant to 42 U.S.C. § 1983, that the

County Defendants violated his Fourth Amendment right to be free of unreasonable searches and

seizures when they confiscated his prosthetic leg.  *See* U.S. Const. amend. IV; U.S. Const.

amend XIV.  Sternberg asserts that seizure of his leg was not reasonable, claiming that it was

without justification and violated jail policy allowing inmates to retain their prostheses.

"The Fourth Amendment prohibits only those searches and seizures that are

unreasonable."  *Goff v. Nix*, 803 F.2d 358, 363 (8th Cir. 1986).  For reasons discussed above, the

evidence establishes that confiscation of Sternberg's leg was both consistent with jail policy and

reasonably related to the legitimate governmental interest in jail security.  *See Pargo*, 49 F.3d at

1356-57 (stating that "when a regulation restricting inmates' constitutionally protected rights is

challenged, the appropriate standard of review is whether the regulation is rationally related to a

legitimate penological purpose" because, when matters of internal prison security are at issue,

"courts should not substitute their judgment for that of prison administrators"); *Goff*, 803 F.2d at

363-64 ("[B]ecause there is no dispute that internal security of detention facilities is a legitimate

31

governmental interest, our inquiry is simply whether petitioners' blanket prohibition on contact visits . . . is reasonably related to the security of the facility." (quotation omitted; omission in original)); *Lyon*, 730 F.2d at 527 ("[S]ubstitution of judicial judgment for that of the expert prison administrators in matters [of health and security] is inappropriate." (quotation omitted)). No genuine issue of material fact remains on this matter, and summary judgment in favor of the County Defendants is warranted.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      The City Defendants' motion for summary judgment [Docket No. 33] is GRANTED.

2.      The County Defendants' motion for summary judgment [Docket No. 28] is GRANTED.

3.      This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 12, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge